### COLE v. AMERICAN BRIDGE CO. et al.
### No. 8719.

Circuit Court of Appeals, Seventh Circuit.

Dec. 13, 1945.

158

Harlan L. Hackbert, of Chicago, Ill., and Glenn D. Peters, of Hammond, Ind. (Peters & Highland, of Hammond, Ind., and Knapp, Cushing, Hershberger & Stevenson, of Chicago, Ill., of counsel), for appellants.

Timothy P. Galvin, Francis J. Galvin, and Edmond J. Leeney, all of Hammond, Ind. (Galvin, Galvin & Leeney, of Hammond, Ind., of counsel), for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from a judgment favorable to plaintiff in an action to recover damages for burns received by him when his clothes were set afire by an electrical arch while he was engaged in dismantling certain electrical equipment in a building at Gary, Indiana, which the defendant, American Bridge Company (referred to as American Bridge) had purchased from the defendant, Tubular Alloy Steel Corporation (referred to as Tubular).

The complaint alleged that the defendants and each of them, carelessly and negligently turned on the power switch and permitted electrical current to flow through the wires plaintiff was working on, and as a result plaintiff was injured. The specific acts of negligence alleged were (1) turning on the electrical current without first ascertaining whether plaintiff was working on the wires in question; (2) failing to warn plaintiff that electrical current was to be sent through the wires upon which he was working; and (3) permitting the electrical current to flow through said

wires in violation of the well established custom and usage known to plaintiff and defendants that if said current was not turned on at 8 a.m. it would not be turned on during such working day.

The case was tried by a jury, which returned a verdict for $15,000 in favor of plaintiff. The trial court required a remittitur of $3,000, and upon plaintiff filing such remittitur judgment was entered in plaintiff's favor for $12,000. Much testimony was heard concerning the nature and extent of plaintiff's injuries, but inasmuch as no attack is made in this court as to the amount of the judgment there appears no occasion to state or discuss the testimony in this respect.

There really is but one issue presented on this appeal, and that is whether the court erred in its refusal to direct a verdict in favor of the defendants. Incidental to such issue is the contention that certain evidence offered by plaintiff was erroneously admitted. Such testimony is relied upon by plaintiff as showing an agreement later communicated to the plaintiff that the wires at or near the point where he was injured would be energized only at certain times.

Plaintiff was an employee of Emerson-Comstock Company, Inc. (referred to as Comstock), which had contracted with American Bridge to dismantle the electrical equipment in the building which the latter had purchased from Tubular by a written agreement dated May 14, 1942. The purchase agreement also conveyed to American Bridge all material "above floor line with the exception of overhead cranes, five (5) of which are to be covered by separate purchase order, and such wiring as may be necessary for the operation of other parts of the mill," and by the agreement American Bridge was to dismantle and remove all material at its own expense.

American Bridge on May 26, 1942 also entered into a written contract with Comstock by which the latter was to dismantle the electrical equipment and material in the building so purchased. The agreement specified that the work by Comstock was to be done under the supervision and direction of M. A. Crawford, representing American Bridge. In accordance with this agreement, Comstock commenced dismantling work about May 27, 1942. One Hagberg had charge of this operation on behalf of Comstock and plaintiff was under his direction and control.

We shall now as briefly as possible state the facts and circumstances leading up to and surrounding the accident by which plaintiff was injured. In so doing, plaintiff is entitled to have the evidence considered in a light most favorable to his theory of the case. Hagberg testified that a day or two after the work started he had a conversation with two supervisory employees of Tubular, Flamme and Westendorf, and Crawford, in charge of dismantling operations on behalf of American Bridge. While there is no direct proof, it is inferable that this conversation took place in the building to be dismantled. According to Hagberg, Flamme stated that the electrical current, including both DC and AC, would be turned on at 8 o'clock in the morning and off at 3:50 in the afternoon, and that any lines which were tested after 8 o'clock and found dead could be assumed by Comstock to be dead lines. Just what part Crawford as the representative of American Bridge took in this conversation is not plain, although he was present and participated. Plaintiff was not present but information concerning the conversation was conveyed to him and other employees by Hagberg. (Admission of the testimony concerning this so-called agreement is one of the main errors relied upon for reversal.)

Plaintiff was first employed by Comstock on this job on June 1, 1942. Two days later Hagberg was told by Crawford to commence dismantling operations in the furnace room. Shortly after 8 a.m. (June 3) Hagberg took one Stempniak (under whose immediate direction plaintiff was working) and plaintiff up on the runway about thirty feet above the floor of the furnace building and gave them orders to test all wires there and cut those which were dead. At this point, several feeder lines or cables running from the motor room led off at right angles to the runway and branched off into a number of "taps" or smaller wires. Hagberg testified that all of the wires in that area were to be cut. Plaintiff saw nothing to indicate to him that there was any current in any of the wires or cables and no one told him that current was about to be put through the wires or cables on which he was working.

All the wires were tested by plaintiff and Stempniak with a volt-meter and found to be dead. At this particular point there was nothing to distinguish AC from DC wires. Plaintiff first cut three of the

smaller wires and then sat on a structural steel beam with his feet braced against one of the feeder cables which he intended to cut next. There was a sudden flash of fire which seemed to come from the cable his feet were on. His clothing caught fire, particularly the right leg of his overalls, from which he sustained the injury complained of. No warning or notice was given by either Tubular or American Bridge that current was to be sent through the wires on the day of the accident. There is some opinionated evidence, somewhat speculative in character, as to the immediate cause of the flash which set plaintiff's clothing afire. Without relating this testimony, it seems sufficient to observe that it probably was caused by a short circuit occasioned when he sat on the steel beam with his feet on the wires or cables which were energized.

At the time plaintiff offered the alleged erroneous testimony, it was objected to on the ground that it had not been shown that Flamme (employee of Tubular) had any authority to make the agreement relied upon. It was admitted subject to plaintiff's promise to show such authority. As already noted, it was shown that American Bridge, Tubular and Comstock were all interested and engaged in the dismantling operations. American Bridge was represented by Crawford, Tubular by Flamme, and Comstock by Hagberg. All three of these concerns either participated in the supervision of the dismantling job or had the authority to so do. About the time the work was to start these three representatives met and the conversation complained of took place.

■ We think there is little, if any, doubt but that they were acting within the scope of their employment. It may be they had no express authority to enter into such an arrangement, but it seems quite plain that they had implied authority to make such plans or agreements as might reasonably be necessary to a performance of the job with which they were confronted. To hold that employees of Comstock, including the plaintiff who had been advised of this arrangement, could not rely thereon would indeed constitute a harsh and unreasonable rule. We suppose if this arrangement had been reduced to writing or printing and distributed to the employees there would be no question about its admission. We see no reason why plaintiff should not be entitled to its bene-

fit from the mere fact that it was communicated to him orally. Admittedly, the question as to whether the arrangement was made was testified to only by one witness and hangs upon a rather slender thread, but that does not affect its admissibility.

■ While we think this evidence was admissible, it is difficult to discern how it can be relied upon as proving a "well-established custom and usage," as alleged in the complaint. We are of the view, however, that we need not decide whether the judgment is sustainable upon this theory. This is so for the reason that in our judgment plaintiff was entitled to go to the jury on defendants' alleged negligence, either in turning on the electric current without first ascertaining where plaintiff was working or in failing to warn plaintiff that the current was to be sent through the wires upon which he was working. Whether the agreement as to the manner and time of turning on the current was or was not sufficient to show a custom or usage, it had a material bearing upon the general charge of negligence.

■■ As already shown, both of the defendants, American Bridge and Tubular, by their supervisors and agents, had charge of the dismantling operations. They likewise had control of the means by which and the time when the wires involved in the dismantling operations would be energized as well as de-energized. The law imposed upon the defendants the duty of exercising reasonable care for the safety of plaintiff and other employees. The courts generally, including those of Indiana, have recognized that electricity is a dangerous force and that a person or company handling it is bound not only to know the dangers incident thereto but is obliged in its use to exercise a degree of care commensurate with its danger. Ayrshire Coal Co. v. Wilder, 75 Ind.App. 137, 129 N.E. 260; Smith v. Appalachian Electric Power Co., 4 Cir., 74 F.2d 647; Conowingo Power Co. v. State of Maryland, 4 Cir., 120 F.2d 870, 873; Perrone v. Pennsylvania R. Co., 2 Cir., 136 F.2d 941, 943.

■ Whether defendants' standard of conduct in the use of this known dangerous agency was such as might be expected of a person of ordinary prudence or whether they failed in this respect and were consequently guilty of negligence were questions properly to be determined by the

triers of the facts. City of Decatur v. Eady, 186 Ind. 205, 115 N.E. 577, L.R.A. 1917E, 242. Neither are we impressed with defendants' argument that the alleged negligence was not the proximate cause of plaintiff's injury. This also was a question for the jury. Ashby v. Philadelphia Electric Co., 328 Pa. 474, 195 A. 887; Conowingo Power Co. v. State of Maryland, supra, 120 F.2d 875.

The judgment is affirmed.